Mr. Zarley. Yes, may it please the Court. Your Honors, my name is Tim Zarley. I'm here on behalf of the appellant, Pocket Plus, and we're here today because of a number of errors made by the District Court regarding the functionality and the acquired distinctiveness of Pocket Plus' trade dress. To begin, the District Court failed to follow this Court's precedent. Can I ask sort of a preliminary question, though? I think you had Iowa common law claims and federal claims here, right? Correct, yes. Can we treat those as if they're the same standard and the same thing, basically? Yes, Your Honor. Okay, thank you. And as I was saying, the District Court failed to follow this Court's precedent with regard to the test for functionality, and that test requires that you must consider the trade dress as a whole and not based on its individual design elements. The District Court did not do that. Instead, the District Court, after finding three of the four design elements to not be functional, found that the fourth element, the vertical profile, was functional, and based on that single element, determined that Pocket Plus' trade dress as a whole was functional. That is inconsistent with this Court's precedent. In fact, Pike-Brands doesn't disagree with us. They didn't cite a single case. They didn't even make an argument that we were wrong on that issue. But that wasn't the only way the District Court erred with respect to functionality. They also erred in finding the vertical profile to be functional, and they reasoned that it was functional because the vertical profile was necessary to hold a 16-ounce bottle. There was no evidence that supported that. That was purely the speculation of the District Court. There was no expert testimony to support that conclusion, no scientific evidence to support it. It was merely speculation. Wouldn't another way of say it, is it common sense? How could you have a horizontal pocket that would hold a 16-ounce bottle, particularly once it was opened? Well, the trade dress doesn't require that it's open. That was a fact that was made up by Pike-Brand. Don't the pictures show that? Well, there's one picture that shows it, yes, Your Honor. I mean, and it's on your website. The picture of one beer bottle, but the other bottles are all closed. And there is other evidence that we submitted, undisputed evidence, that there are horizontal pouches that hold beverage bottles. In fact, Pike-Brand has a square product that holds a water bottle, and that evidence is undisputed. And in the benefit of all reasonable inferences to Pocket Plus, the undisputed evidence that different shape pockets hold water bottles, and the undisputed evidence that these pockets are made of different sizes to hold phones of different sizes. And the only logical inference that comes from that undisputed evidence is that pouches could be made of different sizes to hold bottles of different sizes. So, one of the complaints by the other side was that the content of your, or the elements of your trade dress was a changing or a moving target. What, what is the elements of the trade dress that you're trying to protect here? Well, first of all, that it can be worn outside the clothing, over the waistband, on the hip. Second, that it has a vertical profile. Third, that it has a label that is smaller than one inch. And fourth, that it has photos and illustration, an illustration that emphasizes a vertical profile worn on the hip. Isn't a vertical profile, though, all about functionality? You know, and except for the label, I can see the label perhaps not being functional, but aren't all the other characteristics essentially the function of holding something? But it doesn't have to be. It's not essential to the product to be vertical in order to have a vertical profile. There's evidence that there are horizontal square products that hold, hold items as well. And for 12 years, Pocket Plus was the only company in the industry that had a vertical profile. All the others were horizontal or square. There's at least a couple others that had vertical profiles. But they're not worn in the same way. They're not emphasized that they're worn over the hip, over the waistband. You know, as an example, the Koala product. It's worn on the back of a sports bra. It's also worn on the inside of the shorts. So there are a lot of different ways that these products have been emphasized. But Pocket Plus, for 12 years, consistently marketed their product in the same way, where the product was vertical, was worn over the waistband, and over the hip when it was shown with a person wearing the product. And in addition to the functionality, the district court also erred with respect to acquired distinctiveness. And it erred in this regard with regard to its analysis regarding a single third-party product. The Night Eyes product. And the product holds just a foam. It doesn't hold a water bottle. It typically fits over a belt, not over the waistband. And instead of having a magnetic clip, it has a patented clip that rotates the pocket 360 degrees and allows you to lock it in eight different positions. Now the district court first erred when it considered this product as sufficient to deny Pocket Plus a finding of substantial exclusivity. And by relying on just a single product, in essence, the district court was saying that Pocket Plus had to have absolute exclusivity. And there's no case law that requires absolute exclusivity. Now, it is permissible to rely upon third-party products when evaluating substantial exclusivity, but that is only relevant based on the usage of that third-party product. And here we have no evidence of usage. All we have is a webpage that says that the product existed at some time. There's no evidence of sales, no evidence of advertising, no evidence that this product had any material effect on the substantial exclusivity of Pocket Plus's trade dress. Now, the court also erred in even considering the Nite Ize product because it doesn't fall within the relevant market of Pocket Plus's product. Pocket Plus is a product that has a unique magnetic clip that allows you to attach it over the waistband. So the whole purpose of the product was to eliminate the need for a belt. And in expanding the scope of the market, the district court made the erroneous factual finding that there was no evidence in the record to distinguish that. But there was. There was evidence that both parties in their advertising go to great lengths to distinguish their products as not requiring the use of a belt. But you don't use that as part of your trade dress, do you? No. The use of the magnetic clip is not part of your trade dress, is that correct? It's not. So wasn't the district court correct in ignoring that factor? Not in defining the market. Because in trade dress law, it has more to do with the relatedness of the products. You said your trade dress is you wear it on your hip. Correct. The Nite Ize product, you wear it on your hip. Now, how you put it on your hip is different, but that's not part of your trade dress. Right. So I'm not following your argument. Well, it comes from the advertising of both products in distinguishing that you don't wear it over the hip. Or you wear it over the hip, you don't wear it over a belt. But your trade dress is that you wear it on the hip, not over a belt. You said you're not claiming that wearing it over the pant or slacks without a belt is part of your trade dress. That's not part of your trade dress, right? Right. So your trade dress is you wear it on the hip, right? Correct. So why does it make any difference how you wear it on the hip if it's not part of your trade dress? Because it has to do with what's in the minds of the consumers. What kind of product are they looking for? And if all you have is a pair of running shorts or yoga pants where you don't have a belt, the Nite Ize is not going to do you much good because you need a belt. And so we're talking about the relevant market. We're not talking about what the trade dress is. We're talking about what products compete in this market. And we argue that it is just those that have a magnetic clip, not those that require a belt. Now in addition to that, we contend the district court erred in finding that the Nite Ize product had all of the elements of Pocket Plus's trade dress. One of the elements, as I mentioned, was that it had an illustration of a product that emphasized the vertical profile worn on the hip. And for 12 years, every product that Pocket Plus sold either had a hang tag or was part of a display that had a drawing of black shorts and a drawing of the product fitting on the hip. The district court, in finding that the Nite Ize had all of the elements, didn't even reference an illustration. Instead, they focused on a series of photographs of the Nite Ize that emphasized not a vertical profile, but the patented feature that it would rotate 360 degrees. There was no illustration, nothing that looked like a pair of black shorts drawn and a product drawn to fit over the hip. Now finally, the district court erred with respect to acquired distinctiveness when once it found that the Pocket Plus was not substantially exclusive, it completely disregarded all of the other evidence of secondary meaning. It disregarded its finding that Pike Brands had intentionally copied our trade dress. It disregarded its finding that we'd been selling this product for 12 years and we're the only one emphasizing this trade dress in the market. It disregarded that we had over 800,000 customers. And it disregarded the manner of our advertising, which had resulted in sales of over $7 million. Isn't the normal way of proving that to do surveys and that sort of thing? And was there any evidence like that? There was no evidence of that. I wouldn't say that it's the normal way. It is one way. It is a rather expensive way, but it's not required to prove secondary meaning that way. So we have pointed out a number of ways in which the district court erred with respect to functionality and acquired distinctiveness. And if this court agrees with us, we're done. We don't need to go any further. But if you don't agree with us, then we have to consider whether the district court erred with respect to finding the case exceptional under the Lanham Act. And the legislative history behind the Lanham Act states that the purpose was to protect a party from a gross injustice, not to punish a party. And more recently, the Supreme Court in the Octane case, while it liberalized the factors for finding a case exceptional, still said that a finding of exceptionality is rare. And the cases post-Octane have found things like filing a false declaration, arguing a case based on an incorrect legal theory, or continuing to argue issues decided at trial in post-trial motions as the types of situations that rise to the level of exceptionality. Pocket Plus did nothing even close to that. What the court took issue with was that we clarified an ambiguity in our trade dress. And there's case law that says there's nothing wrong with clarifying an ambiguity. There's case law that says we're not required to use the exact language that is in the complaint to describe our trade dress. And there's even case law that says we can change the trade dress during the course of the trial. District Court also took issue with the fact that we disagreed with regard to the Night Eyes product. And we've outlined the reasons why we disagreed. And the final issue that the District Court took issue with was the fact that we made a minor briefing error that prevented us from obtaining a presumption. None of that rises to the level that we described in the post-Octane cases. And if this court affirms the District Court, that will be the new standard for the Eighth Circuit. If you clarify an ambiguity, if you disagree with the court, and you make a minor briefing error, the case will be found exceptional. And unless there are further questions at this point, I'd like to reserve the rest of my time for rebuttal. Very well. Thank you. Mr. Gilchrist. May it please the Court. My name is Mike Gilchrist. My co-counsel is Christine LeBron-Dykeman. We represent the Defendant Appellee Cross-Appellant Pipe Brands LLC, sometimes referred to in the briefing as Running Buddy. This is a trademark infringement case without a real trademark. Plaintiff's description of its trade dress is an after-the-fact listing of features that it sees in defendant's products that it would like to stop them from using, rather than a good-faith listing of the features that it itself has ever used as a trademark. Any time the trademark features appear in its promotional materials, it's simply to describe what the product is or what it does. It's not being used as a trademark. Take, for example, this feature of an illustration that emphasizes the use on one's hip. That almost never appears in any of their promotional materials. It never appears on their website. It never appears in any of their brochures. It never appears in any of the banners that they use at their trade shows. In the limited instances when they actually do show that illustration, it's completely descriptively. For example, the display that's used in some unknown number of Hallmark stores that began at some unknown time. If you look at that illustration on that display, and you can see it, I think it's in our red brief at page 16, that is completely descriptive. It's telling people how to use the product. It's not being used as a logo. Their complete failure to ever use any of these features as a trademark means we've got a trademark case without a real trademark. It also means my client should prevail on all three appeals. It means there was no valid trademark, so summary judgment was correct. It's the epitome of an exceptionally weak case because they're accusing someone of infringing a trademark that they never used as a trademark. It means every dollar spent by my client was spent in defending against an exceptionally weak case. Their description of their trademarks is also fatally flawed because it includes how a customer chooses to use it after they buy it. This over the waistband at the hip. That's not an immutable feature of this product. That's completely at the option of the consumer. That's not something that can be a trademark because they have no control over it. In the Home Builders Association case, the Eighth Circuit defined a trade dress as the tangible features of a product or its packaging and refused to grant trademark protection, trade dress protection, for the dates and times of a trade show because it's not the type of thing that can even be protected as a trademark. The same thing is true with respect to how a consumer chooses at their option to use a product after they have purchased it and started using it. This is an unregistered trademark, so the plaintiff has the burden of establishing that it is distinctive. That means that when consumers see these features, they think of them as a trademark, not simply as features of the product that make it work better or look better. Supreme Court described this in the Walmart case where they found that when you're claiming the design of your product itself as being a trademark, it's never inherently distinctive because consumers don't naturally think of these features as being a trademark. Here, their product is a, by all appearances, just a rectangular, plain, unornamented pouch. And so they've got a pretty big hill to climb to educate consumers that this is not just a product, but it's in fact a trademark. And they've come to this with no real evidence to get them up the hill. There's no direct evidence that it's acquired secondary meaning. There's no consumer service. That's what you would really need for something like this so we would understand do consumers view this as a trademark. There's no consumer testimony. They didn't have any consumers swear that, yeah, when I see one of these things out in the wild, I instantly recognize it as being a Pocket Plus. Despite being on the market together for about two years by the time they responded to summary judgment, there's no evidence of record that there's ever been any confusion among consumers. The owner says she doesn't really do very much of any direct consumer advertising, and on the record she says I've done maybe a total of $200,000 over the entire life of the product. Well, that amount is not very much, first of all. Second of all, more importantly, they never tell what that $200,000 was spent on or when. That could be $20 million. It wouldn't help them because she never says here's what it was spent on and here's how it was developing secondary meaning. And on the record from what we've seen, again, none of the other uses have actually used any of these features as a trademark. So they failed to meet their burden of showing, their positive burden of showing this unregistered trade dress as a trademark. The district court was correct. What they say is we've just been selling it for so long exclusively that it has developed secondary meaning. Well, and they have sold a lot of them. They've sold 800,000 of them. They've sold several, but for the size of the market, it's not that. I mean, that's over a long period of time. And the market is, some of their ads show kids using it. They say you can use it on your wheelchair, your walker. So it's virtually everybody that this is being marketed to. But as the district court properly found, they've not been the only one using this trade dress. So the Night Eyes product, which the district court relied on, clearly includes all of the trade dress features. It's got an illustration that shows it in a vertical profile. It shows it on the user's hip and it's got an arrow going up and down to emphasize the vertical. It emphasizes the vertical better than their illustration. Their illustration shows the portable pocket from an end view, so you can't tell if it's longer than it is wide. The lack of a magnet does not make this an irrelevant product. First of all, they initially defined their trade dresses including a magnet and then took it out when they filed their amended complaint. So surely they shouldn't be permitted to put it back in. But more fundamentally, what we're looking at for relevant products are things would consumers think the same company is making both these products. And clearly a consumer would think a company that's making one that attaches with a clip also might make the same exact thing that attaches with magnets. Imagine someone that's got a trademark on a shoe and then someone else comes out with another shoe that attaches with Velcro rather than laces. I mean, it's still a relevant product to consider for trade dress concerns. They try to say that there's no evidence that the Nite-Eyes has any substantial use such that they're still a substantially exclusive user. A few responses to that. First, it's their burden of proof to show that it's a substantially exclusive user. And they've not come up with any evidence that this is not a substantial use. And from all indications, it is. If you look at the website that it's presented on, it's a sophisticated website. There's several products in this line that seems to indicate it's a successful product. The packaging for the Nite-Eyes includes a UPC barcode. You're not going to put that on something unless it's being used commercially and for sale. And there's consumer reviews of the product on the website to indicate that, yeah, it has been purchased and people have been using it and are commenting upon it. So the Nite-Eyes by itself is sufficient to show they are not the substantial exclusive user. But that's not the only product that was out there that included how they've defined their trade dress. Most egregiously, the earlier version, an earlier size version of the Mini that my client makes, that the defendant made, includes all the trade dress features. The Mini product that's been on the market since 2014 clearly includes all the trade dress features. They're saying it's not vertical. But, you know, if you look at the confidential appendix at 428 to 429, where the owner of the plaintiff was discussing the Mini product, this earlier product, she admits, number one, that it's vertical. In her own words, it has a vertical look. And then she admitted it has a vertical profile. She said, in fact, that's why we wrote them in 2018, because I thought they had a vertical product. And it is vertical. It's longer than it is wide. There's really no dispute as to that. And, in fact, in that same 428, 429 of the confidential appendix conversation from her deposition, what she says is the reason I didn't object earlier and sat on this for a couple years was because that product doesn't compete with me. And the reason is it's not big enough to hold a cell phone, which we would say, exactly. We need to make it bigger so that it can compete. And we're entitled to do that. It's just a different size of the product we're already making. It's not a different trade dress. So they failed to meet their burden of showing this is a distinctive mark. Mr. Zarley referred to evidence of intentional copying. So, yeah, a few responses to that, if I may. First of all, the only thing that's even potentially copied is the vertical profile. Everything else our client has been making for many, many years and they don't even assert has been copied. That feature, clearly they're entitled to copy. So the reason copying is sometimes indicative of secondary meaning is that the only reason you would be copying it is to piggyback off their goodwill, which means there must be some goodwill there. Otherwise, why are you copying? For a feature like vertical, that just doesn't apply. Clearly, if you look at the products, my client was not trying to copy their product in any way. And really the only evidence that it was copied was it was out during time. In the opinion, the judge notes that they sent a couple letters earlier, but those were the same letters that then on the exceptionality the judge found to be lacking because they never identified any trade dress features. So I don't think there's really any evidence of copying, and to the extent there is, it's not relevant to show secondary meaning in this case. I want to go back for a moment to the circumstantial evidence sufficient to establish secondary meaning. I take your argument to be that the $7 million in sales, the 800,000 units that have been sold, and the $200,000 advertising, which is not described really with greater detail than that, is insufficient as a matter of law, right? It's insufficient both in terms of volume. It's just not that great of a volume for something as plain and ordinary as this to convert the meaning of that. And then on top of that, more importantly, they've just never used it in a way that would indicate to consumers that this is a trademark. They've used it completely descriptively just to describe what the product is. So word marks that are descriptive can only become trademarks after they've been used as trademarks. And they've been using this completely descriptively, not as a trademark. I get that. Does it make any difference what the market itself looks like? Does the world change if we have a regional market as opposed to a national market? I think it does make a little bit of difference, sure. They need to show a substantial portion of the relevant market. And so the relevant market here is really nationwide and on the space is pretty much everybody. They show elementary school kids using it, and they say you can use it on your walker and your wheelchair. So, yes, you're on. And so your argument essentially that if we look at this as a national marketplace, that whatever's been spent, whatever's been sold is insufficient, standing alone, without other evidence. For sure, yes. Consumer testimony or the like. Yes, absolutely, Your Honor. Thank you. So if I understand correctly, you don't acknowledge or concede that any of the elements are trade dress. That's true, Your Honor. That's a factual issue. The fact that they advertise it can be used on a walker, it can be used on your bicycle, it can be used on a baby stroller or whatever it might be. That may go to your argument that wearing it on your hip isn't trade dress, but that's a factual issue. Is that where we are? So for purposes of this motion, the judge assumed, okay, I'll assume that's all trade dress. But if we got to trial, one or more of these, a jury may say, no, that small label's not trade dress, wearing it on your hip's not trade dress. I mean, I think our point is every time they've used it, it's completely descriptively and not as a trademark, which is what is required to be using it as a protectable trade dress. They've shown these features sometimes, but never in a way that it, you know, for example, they point to the Weber grill as an example of a product configuration trade dress. Weber uses that in their logo. No matter what you buy, that's in their logo. They've never done anything even remotely close to that with any of these features. The district court abused its discretion when it implemented a 75% across-the-board cut in determining what reasonable attorney's fees would be for our client in view of this being an exceptional case. First of all, the things that make this exceptional, the never using it as a trademark, defining it in a way that includes the Nite Ize product that our client has been offering for numerous years, these things go to the very foundation of the case. Every dollar spent was spent opposing an exceptionally weak case, not just a portion of it. Furthermore, the June 28 letter and attached motion, that's at page two of the supplemental appendix, was not sent to harass the plaintiff. It didn't harass the plaintiff. It's a very short, perfunctory letter. It sets forth that there's no reasonable basis to continue with this case. Then the motion itself sets forth in detail the reasons why there was not, in fact, a reasonable basis, in fact, or law for continuing with the case. We were entitled to give them this notice under Rule 11 because it did not appear that this case satisfies the requirements of Rule 11. That same motion also, draft motion, sought relief because this was an exceptional case under the meaning of the Lanham Act. There were very similar facts, similar analysis set forth in those. The district court appeared to be applying a rule that if you send a notice to someone that they're violating Rule 11 and then the offending pleading has not been withdrawn, that if you don't follow that up by filing a motion for Rule 11 sanctions, that's per se evidence that this was sent to harass them. There's no authority for adopting that sort of rule, and it's not a good rule. I think we should be commended in this case for not following up with a Rule 11 motion and relying on the Lanham Act exceptional case provisions because it would have largely redundant. It was the same conduct seeking the same relief, attorney's fees, and very similar standards. The traffics case, I would tell your honors, completely controls the functionality issue here. The traffics case, the Supreme Court case, rejected basically the identical arguments they're making. That is, in traffics, the trade address asserted was in a road sign that has springs that help it stay up in the wind. The full trade address was four legs, a base, a riser, the sign, and then the two springs. Everybody agreed that the two springs were functional. What the plaintiff was arguing was that's not my entire trade address. My trade address is the whole thing, so it doesn't matter that just the springs are functional. The Supreme Court said no. The springs are the key to why it works better. It's like the vertical feature of this. It's the whole reason why it works better. Once you show that's functional, attaching these other things that aren't arbitrary flourishes doesn't do away with the functionality of those springs. Similarly and importantly, traffic says, look, there's utilitarian functionality and there is aesthetic functionality. When we're dealing with utilitarian functionality, like we are in this case, something that actually makes it work better, you don't get to the are there alternatives designed. They're not really particularly relevant. If you show this feature is necessary for the purpose of the product, you don't get to the aesthetic functionality consideration of is there a competitive necessity to use this design or are there alternative designs. Once you show it's functional pursuant to the Inwood test, is it necessary to the use or purpose of the article, that ends the inquiry. Furthermore, we have shown that there is a competitive necessity to use these features. The plaintiff's owner went into great detail about why the vertical makes it work better. It's really only runners that would want to wear the horizontal. We're entitled to compete for non-runners by using the vertical profile. At the end of the day, they're claiming a trade dress in an unregistered plain rectangular pouch. They have no direct evidence of secondary meaning, no surveys, no consumer testimony. They define the trade dress in a way that they never use themselves as a trademark. It can't be a trademark because it includes how consumers use it after they buy it. It can never be a trademark. For that reason, our client should prevail on all three appeals. Thank you, Your Honors. Thank you, Mr. Gilchrist. Your Honors, there's just a few things I'd like to address. First of all, Mr. Gilchrist's reference to their threat of Rule 11 sanctions. First of all, I'm not sure he's described it correctly, but I don't think that they understand that the problem with that letter is that they were using it to gain an advantage in the litigation. They sent the letter before we had even responded in summary judgment, and they sent it because they had an upcoming sale that would not go through if this case was not decided by that time. And so the reason they sent the letter was to get us to drop the case because of the upcoming sale. And my understanding of the law is that that is improper and an ethical violation. Mr. Gilchrist also wants to just sweep over the secondary considerations or secondary evidence. He says that you should have a consumer survey or consumer evidence, but that isn't necessary. It's not required, and that's why you have these secondary areas. In fact, this Court has said that to disregard that secondary evidence defies logic and common sense. We think that that's how the District Court erred. We didn't hear any argument that they didn't err in disregarding that evidence. Mr. Gilchrist also referenced this yellow arrow in the night eyes. Well, what they're doing is they are impermissibly dissecting the packaging of the night eyes product. They dissect the wording that the entire series of photos is to emphasize the patented feature of rotating 360 degrees. Mr. Gilchrist also mentioned their mini product, and that's the reason that brought the ambiguity into the case, is that they introduced this product that had a quarter inch length longer than its width. And the facts were that their former owner, during deposition, said that it absolutely did not have the look and feel of Pocket Plus's trade dress, and that every single product that Pocket Plus sells is at least an inch and three quarters longer than the width. Can I just go back? I want to ask a question about the circumstantial evidence of acquired secondary meaning. And there's that Aramati case that's kicking around out there that said that $250,000 is insufficient to be of much probative value, and it says that in 1994, so it's now 25 years later. Does that cast any view on how we should look at your sales numbers, which is $800,000, or 800,000 units, which is not ubiquitous in a national marketplace, and that $200,000 isn't a lot of money in the national marketplace? Does that, you know, without something else, how does the evidence that you're pointing to establish that secondary meaning has been acquired? Well, Your Honor, and I'm sorry I don't remember the case, but in, I believe, our resistance brief, we cited a case that it is necessary for the district court to make an inquiry and an analysis of the manner of the advertising and the results that that advertising produced. We had 12 years of consistent advertising. We didn't change it once. We didn't change pictures. We didn't change anything. We showed it the exact same way. We didn't even modify our product. How does the district court make an inquiry if you don't present any evidence? We did present evidence. We presented evidence of the way we advertised. We presented evidence of the results of that advertising, and they just completely ignored those secondary features. I see my time is up, Your Honor. Thank you. Thank you, Counsel. The court appreciates your appearance and arguments today. The case is submitted, and we will issue an opinion in due course.